LUIS GERMAN-YUNGA,

                Petitioner,

– against –

SUPERINTENDENT S. RACETTE,

                Respondent.

**MEMORANDUM & ORDER**

14-CV-4537 (ERK)

KORMAN, *J.*:

      On May 29, 2008, at his home at 57-41 Penrod Street in Queens, NY, petitioner Luis German-Yunga (hereinafter "petitioner") asked Maria Yauri (hereinafter "Yauri" or "the victim"), his ex-girlfriend, to "come back to him." Trial Tr. 891:25, ECF No. 8. When she refused, he reached into a dresser, pulled out a knife, and slashed her face three times and her stomach once. *Id.* at 892:21, 893:15–22, 966:19–20. He then told Yauri to shower, which she did, and forced her to call her then-boyfriend, Victor Ojeda (hereinafter "Victor"), to tell him that she was back together with petitioner. *Id.* at 895:20, 897:12–22. After the victim called Victor, petitioner locked her in the bedroom and left his apartment, threatening her that, if she were to call the police, he would kill her two daughters. *Id.* at 901:10–12, 18–19. Approximately one hour later, petitioner returned with his brother Pedro, who, after seeing Yauri's wounds, convinced petitioner to leave once again. *Id.* at 902:7, 904:7–10. Soon after, Victor arrived and escorted Yauri by taxi to the hospital to seek medical attention for her injuries. *Id.* at 904:23–25.

      Almost three months later, on the morning of August 12, 2008, petitioner appeared at the outer door of the building in which the victim lived at 104-41 41st Street and rang the exterior doorbell. *Id.* at 1037:24–25. The victim went out onto the balcony of her second-floor apartment

1

to see who was at the front door and petitioner asked if he could see one of her daughters. *Id.* at 925:13–14, 927:2–4. After the victim told him that he could not see the girl, he entered the building—another tenant had opened the exterior door and petitioner held the door so that he could enter as well—and went up the stairs to her apartment. *Id.* at 927:8–25. Yauri did not have time to lock the second lock on her apartment door before petitioner reached it, and it could be opened from outside the apartment if only the first lock were in place. *Id.* at 928:1–3, 986:15–16. As a result, the victim attempted to keep the door to her apartment shut by kneeling down and pushing against it with her hands. *Id.* at 927:25, 928:12–19. Petitioner was able to push inside "by force," *id.* at 989:1, and repeated his demand to see the victim's daughter, *id.* at 930:8–10. When she again refused, he dragged her into the bedroom by her hair. *Id.* at 930:8–10. At that point, petitioner hit Yauri's head against the metal bed frame of her daughters' bunk bed, where her two young daughters had been sleeping moments before, threw her to the floor, stepped on her, and punched her in the face. *Id.* at 931:5–7. Immediately thereafter, he raped her. *Id.* at 933:5–13.

On December 10, 2010, a jury found petitioner guilty of first-degree rape, first-degree burglary, first-degree assault, two counts of second-degree assault, first-degree unlawful imprisonment, and two counts of endangerment of the welfare of a child. *Id.* at 1187:6–18. On April 29, 2011, he was sentenced to a term of imprisonment of twenty-eight years—concurrent sentences totaling seven years for the convictions from the May 29 incident to run consecutively with concurrent sentences totaling twenty-one years for the convictions from the August 12 incident. The judgment of conviction was affirmed. *People v. Yunga*, 973 N.Y.S.2d 356 (App. Div. 2013), *perm. app. denied*, *People v. Yunga*, 22 N.Y.3d 1204 (2014). While his direct appeal was pending, petitioner moved to vacate his judgment of conviction in New York Supreme Court, Queens County, under N.Y. Crim. Proc. Law § 440.10. The motion was denied on January 25,

2013, Order Mot. Vacate J., ECF. No. 8, *perm. app. denied*, Order, *People v. Yunga*, No. 2014-03702 (App. Div. July 15, 2014). Petitioner then filed this petition for a writ of habeas corpus.

## DISCUSSION

Petitioner makes nine claims of error in his petition that were initially raised either in his briefs in the Appellate Division or in his § 440 motion. I address each of these below. The threshold issue with respect to each of these claims is whether the state court's decision on the merits was contrary to or involved an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). "This standard is difficult to meet" because it "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). To constitute an "unreasonable application" of federal law, the state court's decision "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington*, 562 U.S. at 103).

**A. Weight of the Evidence.**

Petitioner claims that his rape, burglary, and assault convictions were against the weight of the evidence. The Appellate Division rejected this argument based on its own review of the record. *Yunga*, 973 N.Y.S.2d at 357. This claim is not subject to habeas review because the weight-of-the-evidence standard is grounded exclusively in state law. *See* N.Y. Crim. Proc. Law § 470.15(5); *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001). It is "well settled that a 'weight of

the evidence' claim is distinct from a 'insufficiency of the evidence' claim and is a state claim . . . that is not reviewable in a federal habeas proceeding." *Smith v. Lee*, No. 11-CV-0530 (MKB), 2014 WL 1343066, at *10 (E.D.N.Y. Mar. 31, 2014) (citing *McKinnon v. Superintendent*, 422 F. App'x 69, 75 (2d Cir. 2011)).

### B. Sufficiency of the Evidence.

Petitioner contends that the evidence was legally insufficient to support his convictions for assault, burglary, and rape. Before addressing each of these arguments, it is worth recalling the overarching standard that evidence is legally sufficient if any rational trier of fact, viewing the evidence in the light most favorable to the state, could find beyond a reasonable doubt that the defendant committed all of the essential elements of the crime. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In other words, "the only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam). The Appellate Division determined that the evidence was sufficient to support the burglary and assault convictions. Because petitioner claimed that the evidence was "legally insufficient"—using that language—only with regard to his convictions for first-degree burglary and first-degree assault on direct appeal, Def.-Appellant's Br. i.–ii., ECF No. 8, the Appellate Division only addressed his legal sufficiency claims on appeal as to those two convictions, *Yunga*, 973 N.Y.S.2d at 357. Nevertheless, petitioner did claim, both on direct appeal and in his habeas petition, that the "guilty verdict for first-degree rape was . . . [also] not proven beyond a reasonable doubt." Def.-Appellant's Br. i.; Pet. Writ Habeas Corpus 4, ECF No. 1. I consider this a legal sufficiency claim with regard to the rape conviction as well.

Moreover, the Appellate Division found that the burglary, assault, and rape convictions were not against the weight of the evidence, *Yunga*, 973 N.Y.S.2d at 357, a conclusion that "necessarily resolves the issue whether the evidence was legally sufficient to sustain the

4

conviction." *Perkins v. Comm'r*, No. 04-CV-2307 (ERK), 2005 WL 3591722, at *1 (E.D.N.Y. Dec. 30, 2005). As the Court of Appeals has explained:

> A guilty verdict based on a legally sufficient case is not the end of our inquiry but the beginning of our weight of the evidence review. . . . "[I]t is necessary to go further before we affirm a conviction and find that the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt."

*People v. Cahill*, 2 N.Y.3d 14, 58 (2003) (quoting *People v. Crum*, 272 N.Y. 348, 350 (1936)). "Obviously, it would be impossible to find that 'the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt' without first concluding that the evidence was legally sufficient to sustain the verdict." *Perkins*, 2005 WL 3591722, at *2.

On habeas review, a "federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). Petitioner faces a high burden to succeed on this claim when "the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review." *Id.* at 6. Indeed, the Supreme Court has referred to this standard for habeas review of state-court legal sufficiency rulings as "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam).

1. <u>The Assault</u>

Petitioner alleges that the evidence was insufficient to establish that he had committed first-degree assault during the incident on May 29, 2008 when petitioner pulled out a knife and slashed the victim. Passing over the Appellate Division's holding that this claim was not properly preserved, the claim is without merit. The relevant elements of the first-degree assault conviction

5

are, first, the defendant must cause serious and permanent disfigurement to the victim and, second, the defendant must intend to cause that result. *See* N.Y. Penal Law § 120.10(2). Petitioner argues first that the assault did not cause serious and permanent disfigurement.

*People v. McKinnon*, 15 N.Y.3d 311 (2010), is the leading case discussing the issue of the sufficiency of the evidence to establish serious disfigurement as it relates to scars inflicted on the victim. The Court of Appeals held that a person is "seriously" disfigured when "a reasonable observer would find her altered appearance distressing or objectionable. The standard is an objective one, but we do not imply that the only relevant factor is the nature of the injury; the injury must be viewed in context, considering its location on the body and any relevant aspects of the victim's overall physical appearance." *Id.* at 315. Significantly, although the scars on the victim in that case were located "at and above the midpoint between the wrist and the elbow," the Court of Appeals did not rely on the fact that the scars were not readily visible or could easily be covered by clothing. *Id.* at 316. Nor, contrary to the suggestion in petitioner's brief to the Appellate Division, did it adopt any per se rule that a scar must generally be visible in order to satisfy the statutory element of serious disfigurement as it defined it. On the contrary, in holding that the evidence in *McKinnon* was insufficient, the Court of Appeals first observed that the two scars were each a little more than an inch in length and then continued its analysis of the evidence as follows:

> Police officers who saw the victim's injuries on the day she suffered them described them as "severe" and "deep." Hospital records show that the victim's flesh was torn but that there was no "exudation" (oozing of fluid from blood vessels). The wounds did not require any stitches. The victim was told to follow up with a plastic surgeon for "optimal" cosmetic results, but there is no evidence that she did so.

*Id.* Moreover, other than the picture of the wound taken on the day of the crime, "[t]here is no later photograph . . . as to what they looked like after they had time to heal . . . ." *Id.* And although the victim displayed her arm to the jury at trial, "there is no contemporaneous description of what

6

the jury saw." *Id.* On this "limited record," the Court of Appeals held that the evidence was insufficient to support a finding of serious disfigurement, stating, "It shows no more than that the victim had two scars of moderate size on her inner forearm. This is certainly a disfigurement, but no basis appears in the record for finding it a serious one, as we have defined the term." *Id.*

By contrast, the evidence in this case—particularly the photograph of the scar on the victim's abdomen, which the victim testified was consistent with the way the wound looked as of the date of her testimony almost three years after the incident, Trial Tr. 916:3–4—showed a scar of at least three to three-and-one-half inches long lying horizontally across the right side of her stomach several inches above her navel. People's Ex. 15, ECF No. 11. This was more than three times the length of the scars in *McKinnon*. Moreover, there was evidence that the victim was hospitalized for two days after the incident, that the laceration to her stomach went into the muscle of her abdominal wall and had to be irrigated and closed, and that she could have died of blood loss if left untreated, *id.* at 781:17–18, 783:10–11, 785:4–5, 787:1, all of which suggests that the injury inflicted on the victim was much more serious than the injury in *McKinnon*.

Petitioner also argues that the evidence was insufficient to establish that he intended to cause serious disfigurement. Nonetheless, the victim testified that, almost immediately after she told him that she did not want to get back together with him, he pulled out a knife and slashed her face three times and her stomach once, *id.* at 892:18–19, 21, 893:14, 22, evidence that supported an inference that he intended to cause serious disfigurement. The victim also stated that he held the knife to her neck while he made her call Victor to tell him that she was back together with petitioner, *id.* at 900:17–21, and that he threatened to hurt her more if she were to try to tell Victor the truth, *id.* at 900:10–12. Under the doubly deferential standard of review required by *Cavazos v. Smith*, 132 S. Ct. 2, 6 (2011) (per curiam), the Appellate Division's determination that the

7

evidence was legally sufficient to show that petitioner had seriously disfigured the victim and had intended to bring about such a result was not objectively unreasonable.

2. <u>The Burglary</u>

Petitioner also contends that his conviction for first-degree burglary was based on legally insufficient evidence. Passing over the Appellate Division's holding that this claim was not properly preserved, it is without merit. The element of the burglary conviction for which petitioner disputes the sufficiency of the evidence is intent. Under New York law, for a person to be guilty of first-degree burglary, he must "knowingly enter[ ] or remain[ ] unlawfully in a dwelling with intent to commit a crime therein . . . ." N.Y. Penal Law § 140.30. "[I]ntent to commit a specific crime is not an element" of the burglary charge. *People v. Mackey*, 49 N.Y.2d 274, 280 (1980). The prosecution "need prove only that defendant intended to commit *a* crime during his . . . presence in the building." *Id.* Moreover, "the intent necessary for burglary can be inferred from the circumstances of the entry itself." *Id.*

Petitioner testified at trial that, when he was outside of the apartment building speaking to the victim, he told her, "I just wanted to see the girls for a while," Trial Tr. 1038:6, and that she subsequently buzzed petitioner into the building and opened the door to her apartment for him, *id.* at 1038:19–20, 22. The victim, however, testified that petitioner appeared outside her building and asked to see her daughter, a request she denied. *Id.* at 927:2, 12–13. Despite this rejection, petitioner proceeded to enter the building by following another resident who had opened the exterior door and then to bang repeatedly on the victim's apartment door, ultimately pushing it open despite the victim's attempts to hold it closed. *Id.* at 927:23, 929:1–6. The victim's daughter testified that she saw her mother using her whole body to try to hold the apartment door shut. *Id.* at 418:3–4. The victim also stated that petitioner "came in by force." *Id.* at 989:1. The jury, as it was free to do, credited the victim's testimony and could reasonably have concluded, from the

8

violent manner in which petitioner made his way into her apartment and from her attempt to keep him out, that he entered with the intent to commit a crime inside.

Moreover, because the prosecution had submitted "independent evidence" of petitioner's guilt, the jury was free to disbelieve his testimony to the contrary and to find that the opposite of what he testified to was true. *United States v. Spencer*, 129 F.3d 246, 251 (2d Cir. 1997); *see also United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir. 1969) (Friendly, J.); *United States v. Selby*, 557 F.3d 968, 976 (9th Cir. 2009) ("[D]isbelief of a defendant's own testimony may provide at least a partial basis for a jury's conclusion that the opposite of the testimony is the truth."). The Appellate Division's finding that the evidence was legally sufficient to support the burglary conviction was thus not objectively unreasonable.

3. The Rape

Finally, petitioner argues that the first-degree rape conviction was not supported by legally sufficient evidence because "the complainant's allegations of penetration [were] very suspect and without medical or credible corroboration." Pet. Writ Habeas Corpus 4. New York's first-degree rape statute requires that sexual intercourse take place, which "occurs upon any penetration, however slight." N.Y. Penal Law § 130.00(1). The victim's daughter, Leonela, who was present during the incident on August 12, testified that "[m]y mom's legs were opened and German's [petitioner's] zipper was down." Trial Tr. 396:25. Moreover, the victim herself testified that petitioner raped her on that day, *id.* at 935:5–6, 8, and that when she became fully conscious again after the assault, she was not wearing any underwear, *id.* at 933:22. Even though the victim's daughter did provide corroboration for her allegation, corroboration is not required to establish rape based upon allegations of forcible compulsion. *See People v. Umber*, 687 N.Y.S.2d 822, 823 (App. Div. 1999); *Matter of Dakota EE*, 618 N.Y.S.2d 133, 134 (App. Div. 1994). Moreover, petitioner's DNA was found on the victim's underwear, *see* Trial Tr. 738:10–11, 750:21–22, and

9

DNA from the victim's boyfriend Victor, with whom she had intercourse on the morning of August 12 before the incident, was found on petitioner's own underwear, *id.* at 740:1–3. Because a rational juror could have found that the elements of first-degree rape were proven beyond a reasonable doubt, the Appellate Division did not apply the *Jackson* test unreasonably.

C. **Ineffective Assistance of Trial Counsel.**

Petitioner alleges on six separate grounds that his trial counsel provided ineffective assistance by failing to: (i) prepare petitioner to testify; (ii) object to the fact that the courtroom interpreters were not sworn in; (iii) object to an amendment to the indictment; (iv) present an intoxication defense; (v) acquire his file from his prior counsel who had assisted him during the pre-trial proceedings; and (vi) object to the unsupervised provision of the 911 tape to the jury during deliberations. These arguments were rejected both by the Appellate Division when raised in petitioner's *pro se* supplemental brief on direct appeal and by the trial court when raised in his motion to vacate judgment under N.Y. Crim. Proc. Law § 440.10.

To prevail on a claim of ineffective assistance, a petitioner must demonstrate that: (i) counsel's representation fell below an "objective standard of reasonableness"; and (ii) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). To show prejudice, "there [must be] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. On habeas review, a state court's holding that counsel provided effective assistance is entitled to a "doubly deferential" review.

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). The question is not "whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). Here, the Appellate Division applied *Strickland* and rejected petitioner's claims. *Yunga*, 973 N.Y.S.2d at 357.

Petitioner first contends that his trial counsel did not consult with him in preparation for his testimony. Prior to his testimony, petitioner's counsel, however, stated on the record: "I have discussed [testifying] with my client on this occasion and on numerous prior occasions [and] he wishes to exercise his right to testify. I have advised him as to the various pitfalls and dangers, but he insists that he would like to exercise his right." Trial Tr. 1017:7–11. The foregoing statement of petitioner's counsel suggests that his counsel spoke to him about his testimony and that petitioner may have overridden advice that he not testify. Moreover, "*Strickland* admonishes against mechanical standards for ineffectiveness, as there is no set rule for the number of times counsel must meet with a defendant." *Jones v. Conway*, 442 F. Supp. 2d 113, 126 (S.D.N.Y. 2006) (citing, *inter alia*, *United States ex rel. Bradley v. McMann*, 423 F.2d 656, 657 (2d Cir. 1970) (rejecting ineffective assistance of counsel claim even though attorney "did not interview or consult with [defendant] until the day trial was to begin")). The rejection of petitioner's claim was thus not unreasonable under the doubly deferential standard applicable here.

Petitioner's suggestion that his counsel's failure to object to the interpreters' not being sworn in constitutes ineffective assistance is equally meritless. Passing over that "[s]ome procedural irregularities, such as this one, do not present constitutional issues," *Hou v. Walker*, No. 96-CV-1365 (RJD), 1996 WL 684442, at *3 (E.D.N.Y. Nov. 20, 1996) (citing *Costa v. Williams*, 830 F. Supp. 223, 224–25 (S.D.N.Y. 1993)), an unsworn interpreter is "cloaked with the presumption of regularity, which 'allows a court to assume that an official or person acting under an oath of office will not do anything contrary to his or her official duty,'" *id.* (quoting *People v.*

*Bicet*, 580 N.Y.S.2d 55, 56 (App. Div. 1992)). Petitioner has not come forward with evidence to rebut that presumption. In fact, when asked at one point if he understood the interpreter on a particular day, he said that he did. Hr'g Tr. 6:3–9, June 29, 2009, ECF No. 8. Petitioner's claim fails on the first prong of *Strickland* because his attorney's conduct was not unreasonable. It also fails on the second prong because the mere fact that the interpreter was not sworn does not go to his competence, nor does it establish that he did not properly translate the proceedings.

In his third such claim, petitioner contends that his trial counsel was ineffective for failing to object to the amendment of the indictment prior to trial. *See* Trial Tr. 3–4. In particular, the trial judge asked the prosecution if its theory for purposes of the first-degree burglary charge was that petitioner entered the victim's apartment unlawfully or that he remained there unlawfully— the two available theories under New York's first-degree burglary statute. The prosecution responded that its theory was only that he entered unlawfully, so the judge asked that the words "or remained" be deleted from the indictment in preparation for charging the jury. *Id.* at 3:5–10. The amendment was proper under N.Y. Crim. Proc. Law § 200.70(1). *See O'Halloran v. Gonyea*, No. 11-CV-0346 (GTS), 2015 WL 93716, at *37 (N.D.N.Y. Jan. 7, 2015) ("An attorney's failure to object to the amendment of an indictment does not constitute ineffective assistance where the amendment itself is valid under New York law . . . ."). This narrowing of the prosecution's theory also could only have aided petitioner's case. Because counsel lacked any strategic reason to object, petitioner's claim fails on the first prong of *Strickland*. It also fails on the second prong because the amendment had no effect on the prosecution's presentation of the case. *See LanFranco v. Murray*, 313 F.3d 112, 120–21 (2d Cir. 2002) (assistance cannot be ineffective for failing to object to amendment of indictment if amendment does not constructively change prosecution's theory).

Petitioner next contends that his counsel was ineffective because he failed to present an intoxication defense at trial.[1] Petitioner testified at trial that, on the dates of both incidents, the injuries to the victim had already occurred by the time he encountered her. *See* Trial Tr. 1025:6–12, 1041:2, 1043:25, 1044:1–9. The defense of intoxication would have been inconsistent with the defense presented by petitioner because it would have necessarily admitted that petitioner *had* committed the acts at issue. "[P]resenting such inconsistent defenses would have been a dangerous tactic, and his attorney should not be faulted or deemed ineffective for failing to pursue such a strategy." *Gssime v. Greiner*, No. 02-CV-4602 (JBW), 2003 WL 23185772, at *16 (E.D.N.Y. Oct. 29, 2003); *see also People v. Moore*, 886 N.Y.S.2d 468, 472 (App. Div. 2009) (defendant may present "alternative defenses at trial, but he is not compelled to do so, especially where the logical inconsistency between those defenses necessarily detracts from the credibility and potential persuasiveness of each"). Thus, petitioner's claim fails on the first *Strickland* prong. The claim would also fail the prejudice prong. Petitioner testified merely that he woke up drunk on August 12, Trial Tr. 1037:21, suggesting that he was not at the height of his intoxication when he arrived at the victim's home that morning—a notion buttressed by the precision of his testimony about the events that occurred over the course of the remainder of that day. Since petitioner has not established that he had a colorable intoxication defense, he could not have been prejudiced by counsel's failure to raise the issue. *See Swail v. Hunt*, 742 F. Supp. 2d 352, 366 (W.D.N.Y. 2010).

Petitioner's next ineffective-assistance claim alleges that "there exists a viable issue as to whether or not [his trial counsel] was even in possession and/or provided" material from pre-trial hearings, in which he was represented by different counsel and in which his testimony was elicited

---

[1] Petitioner also claims that "[t]rial counsel was required to have objected to [a] deficient [jury] instruction on *intent*" as a corollary to the claim that counsel should have put forth an intoxication defense. Since this claim hinges on the reasonableness of the attorney's conduct in not pursuing an intoxication defense, which I reject, I also reject the claim regarding the jury instructions, as counsel's decision on that issue was necessarily reasonable as well.

that he was drunk during the August 12 incident. There are no facts in the record to suggest that trial counsel did not obtain the complete file from pre-trial counsel when he took over the representation. At the hearing at which the relevant testimony was elicited, the prosecutor stated, "I have a document signed by me and defense counsel with the *Rosario* that was handed up to [pre-trial counsel] which I'm handing up to the Court to be part [of the] court file," suggesting that the complete file was provided, and was available, to trial counsel. Hr'g Tr. 3:6–9, May 11, 2009, ECF No. 8. Indeed, the attorney who represented petitioner at the pre-trial hearing, on withdrawing from the representation due to petitioner's lack of cooperation, agreed to "appear on the adjourn date with [his] entire voluminous file," Hr'g Tr. 6:17–18, June 29, 2009, ECF No. 8, or to "drop the file off" with the court, *id.* at 7:6. There is no reason to assume that he did not carry out his expressed intention. *Cf. Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295–96 (1892) (evidence of intent admissible to suggest that declarant thereafter acted in accordance with that intent). Nor has petitioner pointed to any evidence that could possibly have affected the outcome of the case even if these pre-trial materials had not been turned over.

Petitioner's last ineffective-assistance claim is that his counsel was ineffective for failing to object to allowing the tape of the victim's daughter's 911 call during the August 12 incident to go to the jury room unsupervised during deliberations. *See* Trial Tr. 1165:12–13, 15. However, under New York law, it is only where a tape is *not* played during trial that it cannot be permitted in the jury room. *People v. Morgan*, 535 N.Y.S.2d 97, 97 (App. Div. 1988). In this case, the tape was admitted into evidence and played for the jury in open court during the trial. Trial Tr. 415:2–3, 1124:21. Petitioner's counsel's conduct was thus not ineffective.

### D. Improper Communication with the Jury.

Petitioner also claims that the trial judge failed to admonish the jury properly before the jurors left for the day the evening before they returned their verdict and that an unauthorized

14

communication with the jury must have taken place the next morning as the jury was not instructed to begin deliberating again on the record. Specifically, petitioner speculates that, because the "transcript[ ] reflects that on [the day the verdict was announced], the case was not 'called to the calendar' on the record that morning for reassembling . . . there had to have been some unauthorized communication and/or contact with the jurors by someone prior to their verdict." Pet. Writ Habeas Corpus 11. Presumably, petitioner is suggesting that the jurors must have been told off the record to resume deliberations. But the judge did properly and thoroughly admonish the jury, *see* Trial Tr. 1179:9–1182:24, specifically instructing them not to begin deliberations the next morning until all twelve jurors arrived in the jury room, *id.* at 1179:11–15. This instruction explains as well why the jury did not return to the courtroom the following morning to be formally instructed to begin deliberating and instead went straight to the jury room. There is, moreover, a "presumption of regularity [that] attaches to judicial proceedings" that may be "overcome only by substantial evidence," *People v. Velasquez*, 1 N.Y.3d 44, 48 (2003), and petitioner has failed to offer any such evidence. This claim is thus without merit.

**E. False Testimony.**

Petitioner next argues that his conviction was based on perjured statements presented at trial by Leonela Yauri and Victor Ojeda—both testifying principally as to the events of August 12.[2] Specifically, he contends that Leonela's testimony must have been false because she could not see the events occurring in the apartment from her bedroom. Moreover, he points to inconsistencies in Victor's testimony: Victor claimed that he placed a phone call to Leonela after he arrived at work on August 12. When she told him that petitioner was in her mother's apartment,

---

[2] In this section of his petition, petitioner also alleges that "Victor gave statements admitting guilt to these crimes, but they were never introduced at trial" and that "[V]ictor was also 'coached' by" the prosecutor. Pet. Writ Habeas Corpus 8–9. I reject these claims as vague and entirely unsubstantiated by the record. *See Jones v. Conway*, 442 F. Supp. 2d 113, 125 (S.D.N.Y. 2006) (collecting cases rejecting claims on habeas review due to vagueness). Presumably, if these allegations had any merit, petitioner's counsel would have made use of the alleged statements at some point throughout the state-court proceedings.

15

Victor told her to call 911, but, according to petitioner, the time of the 911 call did not fall chronologically after the time at which Victor remembered arriving at work. Pet. Writ Habeas Corpus 8–9. The Appellate Division held that this claim was meritless. *Yunga*, 973 N.Y.S.2d at 357. I agree. "The trier of fact . . . holds 'the responsibility . . . fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Tibbs v. Florida*, 457 U.S. 31, 45 n.21 (1982) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The jury resolved any inconsistencies in the testimony in this case and drew reasonable inferences to reach its verdict.

Even if I were to believe the factual allegations underlying the claim and construe it as one asserting a violation of the Due Process Clause, it would be meritless. *See Grant v. Ricks*, No. 00-CV-6861 (JBW), 2003 WL 21847238, at *4 (E.D.N.Y. July 29, 2003) ("A conviction based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment." (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959))). "[A] showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief." *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003).

"[B]ecause the Supreme Court has not clearly established that habeas relief is available in the absence of prosecutorial knowledge of perjury, AEDPA prevents granting the writ on such grounds." *Grant*, 2003 WL 21847238, at *4 (citing *Drake v. Portuondo*, 321 F.3d 338, 345 n.2 (2d Cir. 2003)). Petitioner makes no allegation that the prosecution knew or should have known of the alleged falsity of the statements and there is no evidence in the record to support such an idea. Moreover, the inconsistencies alleged are minor and given the victim's testimony—which would support a conviction without that of her daughter or of Victor—it is unlikely that he would be able to show the prejudice necessary to overturn a conviction even if the prosecution knew it was presenting false testimony. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (court must

set aside conviction based on perjured testimony only if prosecutor "knew, or should have known" of perjury and "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury").

**F.** ***Brady*** **Violation.**

Petitioner next argues that, in order for the victim's daughter Leonela to have presented evidence to the District Attorney and the grand jury during the pre-trial investigation, she was required to have gone through a "swearability hearing" under N.Y. Crim. Proc. Law § 60.20(2), which provides that "[a] witness less than nine years old may not testify under oath unless the court is satisfied that he or she understands the nature of an oath." Petitioner argues that the prosecution was under an obligation to provide the transcript of that hearing to him. This claim was raised in petitioner's § 440 application; it is unclear whether he is arguing that the obligation to provide the transcript was imposed by state law, *see People v. Rosario*, 9 N.Y.2d 286 (1961),[3] or whether he is alleging the suppression of *Brady* material. In his § 440 motion, petitioner acknowledges that he "relies upon the authority of" a state-law case, *People v. LaSalle*, 663 N.Y.S.2d 79 (App. Div. 1997), for this contention, *see* Mot. Vacate J. 11, ECF. No. 8, but he does briefly mention *Brady* in his reply affidavit in support of that claim, *see* Reply Aff. 2, ECF No. 8.

Assuming that this reference to *Brady* is sufficient to exhaust that claim, it is without merit. The Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Favorable evidence includes exculpatory and impeachment evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable

---

[3] If the claim were made under state law, it would not present a basis for federal habeas relief. "Because the *Rosario* rule is purely an issue of state law, it does not present a federal constitutional question upon which habeas relief can be premised." *Jingzhi Li v. Lee*, No. 14-CV-3984 (ERK), 2015 WL 1182739, at *4 (E.D.N.Y. Mar. 13, 2015).

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." *Id.* at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

In the instant case, it is inconceivable that Leonela's testimony at the "swearability hearing," which would have addressed only her ability to understand "the nature of the oath," would have provided any material that could have been used to impeach her trial testimony relating to the events that she witnessed. Thus, there is not a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different. Petitioner does not allege that Leonela changed her story or was incompetent to provide evidence. Indeed, there was no swearability hearing at trial because Leonela was old enough to testify without one. In any case, Leonela's testimony was not material. "Materiality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001). The victim testified to the actions of petitioner in great detail and there was DNA evidence—as well as the testimony of police officers involved in the investigation—to corroborate her allegations, such that it is likely that a jury would have convicted without the testimony of the victim's daughter. The failure to produce the transcript of the swearability hearing did not affect the outcome of the trial. As a result, petitioner's *Brady* claim is without merit.

### G. Excessive Sentence.

Lastly, petitioner challenges his sentence on the ground that it is excessive—a claim rejected by the Appellate Division. *Yunga*, 973 N.Y.S.2d at 357. "No federal constitutional issue

18

is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Upon his conviction for first-degree assault, a class B violent felony, *see* N.Y. Penal Law §§ 70.02(1)(a), 120.10, the court sentenced German-Yunga to seven years in prison. That sentence falls within the range—on the low end, in fact—prescribed by New York law. *Id.* § 70.02(3)(a). Moreover, upon his conviction for first-degree rape, also a class B violent felony, *see id.* §§ 70.02(1)(a), 130.35, the court sentenced him to twenty-one years in prison. That sentence also falls within the range prescribed by New York law. *Id.* § 70.02(3)(a).[4] And because the assault and the rape occurred as separate acts—on separate dates—the court legally ordered the petitioner to serve the terms consecutively. *See id.* § 70.25(2). While the Supreme Court has on rare occasions declared unconstitutional sentences that were legally imposed under state law, *see, e.g.*, *Solem v. Helm*, 463 U.S. 277 (1983), petitioner's claim here does not meet the extraordinarily high standard for challenging a legally imposed sentence.

## CONCLUSION

The petition is denied. I also deny a certificate of appealability.

**SO ORDERED.**

Brooklyn, New York
Filed: January 22, 2016
Amended: January 27, 2016

*Edward R. Korman*
Edward R. Korman
United States District Judge

---

[4] While I consider here only the first-degree assault and first-degree rape sentences, the sentence would still not be excessive if I were to consider instead the equally lengthy second-degree assault sentence, which is to run concurrently to the first-degree assault sentence for the May 29 incident, or the first-degree burglary sentence, which is to run concurrently to the first-degree rape sentence for the August 12 incident. The seven-year sentence for second-degree assault and twenty-one-year sentence for first-degree burglary are both within the range prescribed by state law. *See* N.Y. Penal Law § 70.02.